432 So.2d 1359 (1983)
CAPELETTI BROTHERS, INC., Appellant,
v.
STATE of Florida DEPARTMENT OF GENERAL SERVICES, and Bergeron Land Development, Inc., Appellees.
No. AQ-115.
District Court of Appeal of Florida, First District.
June 7, 1983.
*1360 Kenneth G. Oertel of Oertel & Hoffman, Tallahassee, for appellant.
Thomas M. Beason and Sylvan Strickland, Tallahassee, for DGS.
Michael E. Zealy, Fort Lauderdale, for Bergeron.
NIMMONS, Judge.
Capeletti Brothers, Inc. (Capeletti), appeals from a final order of the Department of General Services (DGS) awarding Bergeron Land Development, Inc., (Bergeron) a contract for rough site preparation and grading for the proposed Reception Center and Correctional Institution in Dade County. For reasons hereinafter discussed, Capeletti claims that neither Bergeron nor any of the other contractors who submitted bids were capable of performing the contract.[1] We affirm the award.
The chronology of the pertinent facts leading up to the subject controversy, which facts were found by the Department of Administrative Hearings (DOAH) hearing officer and subsequently adopted in DGS' final order appealed from, are set forth in the succeeding paragraphs.
On June 21, 1982, DGS issued specifications and contract documents as a basis for competitive bidding on the proposed correctional facility. The specifications required *1361 each bidder "... to be familiar with all federal, state and local laws, ordinances, rules and regulations that in any manner affect the work" and that "ignorance on the part of the bidder will in no way relieve him from responsibility." The specifications also provided:
Bidders are required, before submitting their proposals, to visit the site of the proposed work and completely familiarize themselves with the nature and extent of the work and any local conditions that may in any manner affect the work to be performed and the equipment, materials and labor required. They are also required to examine carefully the drawings, specifications and other bidding documents to inform themselves thoroughly regarding any and all conditions and requirements that may in any manner affect the work.
The specifications further provided that requests for correction or interpretation of the meaning of the drawings and specifications or other bidding documents should be in writing, addressed to DGS' consulting architect/engineer, and that all such interpretations and supplemental instructions would be in the form of written addenda to the bidding documents.
Before submitting its bid, Capeletti, by letter of July 6, 1982, called to the attention of the architect/engineer that an existing road running parallel to and near the northern boundary of the project site, which road was designated on the site location drawing as N.W. 41st Street, was not a public road, but, instead, a private road on private property. In fact, the road was owned by Florida Power and Light Corporation and had not been dedicated for public use. Pursuant to a license agreement entered into three years earlier, Capeletti was given permission by Florida Power and Light to use the road for "access for hauling rock and fill." A fence with a gate installed by Capeletti at some time in the past blocked access to the road and a sign on the gate stated that the road was under private ownership.[2] In its letter to the architect/engineer, Capeletti inquired whether another access road would be provided to the successful bidder. The architect/engineer did not issue a written addendum or otherwise notify prospective bidders that N.W. 41st Street was not a public road.
Lump sum bids were submitted and the bids were opened on July 14, 1982. Bergeron was the low bidder at $1,985,000. The second lowest bid was $2,390,000 and Capeletti, the fourth lowest bid, was $2,560,000. A total of twelve contractors submitted bids. The estimated DGS budget for the project was $2,400,000.
On August 19, 1982, DGS gave written notice to all bidders of its intent to award the contract to Bergeron. Capeletti filed a notice of protest within 72 hours pursuant to Section 120.53(5), Florida Statutes, and within 10 days thereafter filed its Petition for Formal Hearing pursuant to Section 120.57(1), Florida Statutes. Capeletti's petition requested that it be awarded the contract on the grounds that it was the only bidder having access to the project site. In the alternative, Capeletti asked that all bids be rejected and the project be readvertised.
On September 22, 1982, DGS notified in writing Bergeron and Capeletti that it was rejecting all bids for the reason that the drawings erroneously showed a public street, N.W. 41st Street, adjoining the project site's northernmost boundary and that such was misleading. Bergeron then filed a notice of protest and a petition for a Section 120.57(1) hearing. The Capeletti and Bergeron petitions were consolidated for hearing before a DOAH hearing officer. The hearing was concluded on October 25, 1982, and the hearing officer filed his recommended order with DGS on November 10 recommending that the contract be awarded to Bergeron. After the filing of exceptions to the recommended order, DGS issued its final order receding from its previously expressed intention to reject all bids and awarding the contract to Bergeron *1362 from which order Capeletti appeals pursuant to Section 120.68, Florida Statutes.
From the time that the bids were invited through the October 25, 1982, final hearing, there was no existing road for use by contractors in gaining access to the project site. In accordance with the bid specifications and contract documents, Bergeron visited the project site prior to submitting its bid and, through observation and inquiry, determined that the roadway shown on the project drawings as an extension of N.W. 41st Street along the northern boundary of the property was not, in fact, a dedicated public road. As of the time of the hearing, Bergeron had not yet worked out definitive plans for gaining access to the site but indicated that it planned to obtain permission from adjacent property owners for temporary use of their property.
One of the reasons advanced at the hearing by DGS for its announced intention to reject all bids is that failure to do so could result in Bergeron's claiming damages for delay in obtaining access to the job site, the contract documents providing for delay damages to the contractor in case of a delay for reasons other than changes in the work. The amount provided for delay damages would be 10 per cent of the contract price per day, divided by the number of days in the 150-day contract period. The hearing officer found such fear to be unfounded for two reasons. First, the contract time does not begin to run until DGS issues a notice to proceed. Since no contractual provision sets an exact time within which any such notice should issue, "it may well be that either DGS or Bergeron can solve an access problem before issuance of the notice to proceed." Second, the hearing officer found that Bergeron submitted its bid with full knowledge that no public access was afforded and that it planned instead to furnish its own method of gaining access. Also, the hearing officer noted that Bergeron on contended at hearing that it intended to perform the obligations of the contract at the price it had bid, including providing its own access to the site, and that, under such circumstances, it would seem improbable that any claim for delay concerning access could be deemed meritorious.
The hearing officer concluded that the contract documents did not contain a mistake of material fact concerning access to the job site. He also concluded that the parties were not misled by the depiction of the road at the northern boundary of the project site and that there was no testimony that any other bidder was misled. The hearing officer concluded that since: (1) Bergeron had acknowledged at hearing that it would have responsibility to obtain access; (2) Bergeron assumes it will be required to abide by the terms of the contract including time limitations; and (3) no evidence was presented that Bergeron would not gain access to the job site; the evidence therefore did not support the contention that Bergeron would be unable to perform the contract. Capeletti filed exceptions to the hearing officer's recommended order in which the hearing officer recommended that the contract be awarded to Bergeron. On December 8, 1982, DGS entered its final order adopting the hearing officer's findings of fact and conclusions of law and awarding the contract to Bergeron.
Capeletti, the fourth lowest bidder, does not now contend, as it did in its § 120.57 petition, that it should have been awarded the contract as the only bidder having access to the project site.[3] Capeletti, however, contends that DGS erred in not rejecting all bids and readvertising.
At the outset, we should note that we are not dealing with a failure of an apparent low bidder to comply with bid specifications or applicable bidding statutes. E.g. E.M. Watkins & Co. v. Board of Regents, 414 So.2d 583 (Fla. 1st DCA 1982). In fact, Capeletti does not argue that Bergeron's *1363 bid was "unresponsive" to the specifications.
Next, we address the question of whether, contrary to the hearing officer's conclusions, the site drawings contained a material misrepresentation necessitating the rejection of all bids. When viewed in the light of all of the circumstances in this case, the error in the site drawings was not so material as to require DGS to reject all bids. No evidence was presented to show that anyone was misled. Bergeron, as required by the bid specifications and contract documents, visited and inspected the project site prior to submitting its bid and discovered that the road depicted at the northern boundary of the site was not a public road. Well in advance of bidding, Capeletti also knew the situation in regard to the road and, in fact, had made contractual arrangements of its own three years earlier for use of the road. And, of course, prior to receiving the bids, DGS was also aware of the fact that the road was a private one. No evidence was presented at the hearing to show that any of the other bidders were misled. Further, there was no evidence that any bidder acquired an economic advantage over the others by reason of the depiction of the private road as an extension of N.W. 41st Street. Although the other bids were substantially greater than Bergeron's, there was no evidence that any of the other bids were inflated or otherwise affected by reason of the mistake in the representation of N.W. 41st Street.
Next, we consider Capeletti's claim that Bergeron was not a "responsible" bidder. In effect, Capeletti's position is that Bergeron should be disqualified because it had not finalized arrangements for gaining access to the project site at the time of the hearing. Of course, a public authority is authorized to reject the bid of any contractor who cannot perform the contract. In recognition thereof, the specifications applicable to this project provided:
The owner reserves the right to reject any and all bids when such rejection is in the interest of the State of Florida, and to reject the proposal of a bidder who the Owner determines is not in a position to perform the Contract ... . (emphasis supplied)
In Florida, a public body has wide discretion in soliciting and accepting bids for public works contracts and its decision, when based upon an honest exercise of such discretion, will not be set aside by a court even if it may appear erroneous and even if reasonable persons may disagree. Liberty County v. Baxter's Asphalt & Concrete, 421 So.2d 505, 507 (Fla. 1982); Culpepper v. Moore, 40 So.2d 366 (Fla. 1949). To overturn DGS' award of the subject contract, we would need to find that the award to Bergeron was arbitrary and capricious. Mayes Printing Company v. Flowers, 154 So.2d 859, 864 (Fla. 1st DCA 1963); William A. Berbusse, Jr., Inc. v. North Broward Hosp. D., 117 So.2d 550 (Fla. 2nd DCA 1960). We cannot say as a matter of law that it was unreasonable, arbitrary or capricious for the awarding authority to accept Bergeron's representation at the hearing that, although it had not yet made definite arrangements to gain access to the project site, it nevertheless assumed responsibility therefor at the amount for which it bid the job. No evidence was presented to indicate that Bergeron would not be successful in doing so. However, even if the evidence presented at the hearing showed that DGS was going to assume any responsibility for acquiring access to the job site, such would not bolster Capeletti's case for rejection of all bids. That conclusion would undoubtedly be different if the evidence showed that the unsuccessful bids were inflated to include amounts to defray costs of access.
Capeletti also contends that the hearing officer erred in not imposing upon Bergeron the burden at hearing to prove that DGS' previously announced intention to reject all bids was arbitrary, capricious and unreasonable. Capeletti misconceives the purpose of the § 120.57 hearing. The rejection of the bids never became final agency action. As we have previously held, APA hearing requirements are designed to give affected parties an opportunity to change the agency's mind. Couch Const. *1364 Co. v. Department of Transp., 361 So.2d 172, 176 (Fla. 1st DCA 1978); McDonald v. Department of Banking & Finance, 346 So.2d 569, 584 (Fla. 1st DCA 1979).
Section 120.57 proceedings are intended to formulate final agency action, not to review action taken earlier and preliminarily.
McDonald, supra at 584.
Finally, Capeletti says that the hearing officer departed from the parties' stipulation announced at the commencement of the hearing that although both Capeletti and Bergeron had filed § 120.57 petitions, Bergeron "would occupy the position of petitioner" and would "bear the ultimate burden of persuasion." We do not agree that the hearing was conducted in such a way as to violate such stipulation.
As found by the hearing officer, and thus by DGS in its final order appealed from, DGS has been involved in siting and designing this project since 1974. Early completion of the entire correctional facility is necessary as a part of the Department of Corrections' efforts to ease the problem of prison overcrowding and to bring the state's corrections system into compliance with federal court orders. As previously stated, there was no evidence that any of the bidders were misled by the error in representing N.W. 41st Street as a public road. In fact, the evidence presented was directly to the contrary. There was no evidence that Bergeron gained any economic advantage by reason of the error regarding the depiction of N.W. 41st Street or that any of the other contractor's bids were inflated as a consequence thereof. We find that the hearing officer's findings of fact, which were adopted by the final order appealed from, are supported by competent, substantial evidence and that the proceedings in which the findings were based did not depart from the essential requirements of law.
The order of DGS awarding the subject contract to Bergeron, the low bidder, is therefore AFFIRMED.
ERVIN and WENTWORTH, JJ., concur.
NOTES
[1] No issue has been raised on appeal regarding the standing of Capeletti, the fourth lowest bidder, to challenge DGS' agency actions. In any event, Capeletti's interest would appear to be substantial enough to support such standing. See Couch Constr. Co. v. Department of Transp., 361 So.2d 184 (Fla. 1st DCA 1978).
[2] Although the Florida Power and Light Road runs parallel to the northern boundary of the project site, there is a 103-foot strip of land separating the road and northern boundary.
[3] Even Capeletti, however, had apparently not finalized its arrangements for access to the project site by the time of the hearing since, as previously noted in footnote 2, supra, there still existed a 103-foot strip between the Florida Power & Light road and the project site's northern boundary.